Peter C. Bronson, Cal. Bar No. 60669
LAW OFFICES OF PETER C. BRONSON
A Professional Corporation
770 L Street, Suite 950
Sacramento, California 95814
Telephone: (916) 444-1110
Facsimile: (916) 361-6046

Special Counsel for Plaintiff Fred Hjelmeset,
Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re*: <br><br> CT DRIVES, LLC, <br><br> Debtor. | Case No. 11-60198 SLJ <br><br> Chapter 7 <br><br> Adv. No. 13-05154 |
| FRED HJELMESET, Chapter 7 Trustee, <br><br> Plaintiff, <br><br> v. <br><br> WAYNE K. HIGASHI, etc., *et al*, <br><br> Defendants. | **PLAINTIFF'S TRIAL BRIEF** <br><br> Trial: February 5-6 and 8-9, 2018 <br> Time: 9:00 a.m. <br> Place: U.S. Courthouse <br> 280 South First Street <br> San Jose, CA 95113 <br> Judge: Hon. Stephen L. Johnson |

**I.     INTRODUCTION.**

    Plaintiff Fred Hjelmeset, Chapter 7 Trustee (the "Trustee") alleges that debtor CT Drives, LLC ("CTD" or 'Debtor"), for the approximately three years in which it did business prior to its Chapter 11 filing, existed essentially as a shell. Its purpose was to funnel its revenues and investor funds to defendant Wayne K. Higashi ("Higashi") and his insiders, accomplices and *alter egos*. Sums substantially in excess of the company's cumulative gross sales were transferred to Higashi and the other defendants, and commingled among them.

    In light of these and other facts, the case was converted to one under Chapter 7 on October 16, 2012, almost exactly one year after the Chapter 11 case had been filed. Almost immediately

after the conversion, Higashi and other defendants formed a new entity, Spruli, LLC ("Spruli"), to take over CTD's valuable tangible and intangible assets without consideration, and to exploit those assets without having to turn over the assets or their value to the creditors in this case.

Debtor's books and records consisted of a set of QuickBooks schedules and ledgers, with all of the business entity defendants' finances consolidated and commingled therein. The records show millions of dollars in funds either wrongfully transferred out of CTD or, in some instances, recorded in CTD's ledgers without any corresponding references in bank statements, agreements or otherwise.

**II.      THE PARTIES.**

Besides Higashi and Spruli, the defendants in this proceeding are:

1. Higashi and his wife, Rose Higashi ("R. Higashi") as trustees of their family trusts. The trusts received substantial distributions from the Higashi entities;

2. Debtor's related entities Innovative Technologies Licensing and Management Corporation ("ITLMC"), EPX, Inc. ("EPX"), ES Design, LLC ("ES Design") and Spruli (sometimes collectively the "Higashi Entities"), all of which are alleged by the Trustee to be *alter egos* of Higashi and of each other;

3. Robert Marangell ("Marangell"), who provided financial advice to Higashi and was instrumental in devising the multi-layered transfers that ensured distributions to the defendants to the exclusion of CTD's creditors.

In the course of a settlement conference conducted by Judge Charles Novack, the Trustee's claims were settled as against defendants Lanlogic, Inc., Thomas L. Bahrick, Barry N. Young and Perisho Tombor Brown, PC. Accordingly, this case proceeds against Higashi and R. Higashi, ITLMC, EPX, ES Design, Spruli and Marangell.

**III.     NON-APPEARING DEFENDANTS.**

Defendants' counsel, William C. Milks, III, has withdrawn as counsel for all defendants except Marangell.[1] As the parties discussed with the Court at the Pre-Trial Conference, the Higashi Entities cannot appear *pro se* in this case, and the Trustee will be presenting a proposed Order or

---

[1] Apparently, Higashi plans to appear at trial *in propria persona*, and R. Higashi does not plan to appear.

Orders for default of those defendants. But in addition, neither Mr. nor Mrs. Higashi can appear on behalf of their family trust, "because in this capacity [he or she] would be representing *interests of others* and would therefore be engaged in the unauthorized practice of law." *Ziegler v. Nickel*, 64 Cal.App.4th 545, 548 (citation omitted; italics in original). Accordingly, the Trustee also will seek entry of the Trust's default, and/or to disqualify either of the Higashis from purporting to appear on its behalf.

IV. **THE TRUSTEE'S CLAIMS.**

A. **First through Fifth Claims for Relief.**

These claims for relief are brought against Higashi, Higashi and R. Higashi as Trustees, ITLMC, EPX, and ES Design respectively, to avoid wrongful transfers made to each of them by Higashi on behalf of CTD. While the captions of all five of these claims invoked both Sections 544 and 548 of the Bankruptcy Code, the Trustee seeks relief based on Section 548 only, on theories of both actual and constructive fraud. The captions for these first three claims also referred to California Civil Code Sections 3439.04-.05, but not as an additional basis for substantive relief; the Trustee makes reference to California state law solely to confirm that the four-year California statute of limitations applicable to avoidable transfers may be applied, to the extent necessary, to the Trustee's claims.

Section VI(A) below lists the principal transactions challenged by the Trustee. As to many, Debtor has already admitted through discovery that they were intended to harm the non-insider creditors of CTD [11 U.S.C. § 548(a)(1)(A)]; were made for less than a reasonably equivalent value in exchange therefor [§ 548(a)(B)(i)]; and/or were made when CTD was insolvent or would be rendered insolvent as a result of such transfers [§ 548(a)((B)(ii)]. As to any transactions where the elements of the Trustee's Section 548 claims are not admitted, the Trustee will present both documentary evidence and live testimony demonstrating the validity and scope of the claims.

B. **Sixth through Ninth, and Thirteenth, Claims for Relief.**

The Sixth, Seventh, Eighth, Ninth and Thirteeenth Claims for Relief sought to avoid wrongful transfers made to defendants Bahrick, Young, Perisho and Lanlogic respectively. The Trustee prayed for relief against those four defendants based on their receipt of the transfers, and

against Higashi for his role in making the transfers.  In light of the settlement of the claims against Bahrick, Young, Perisho and Lanlogic, the Trustee does not intend to proceed against any defendant on the Sixth, Seventh, Eighth, Ninth and Thirteeenth Claims for Relief.

**Tenth Claim for Relief.**

The Tenth Claim is brought against Higashi and Marangell.  As with the First through Fifth Claims, the Tenth is based substantively on Bankruptcy Code Section 548, and invokes the California Uniform Voidable Transfers Act solely with regard to any statute of limitations issues (although none of the defendants have raised any such issues).

Marangell, Debtor's *de facto* CFO and the strategic advisor to Higashi, knew that Debtor was insolvent before he and Higashi committed the acts and conduct that are the subject of the Trustee's claims.  The Trustee also will show that Marangell was directly and intimately involved in the conveyance of assets among Debtor and the Higashi Entities; facilitated the transfer of assets out of Debtor for the express purpose of making those assets unavailable to creditors; and worked with Higashi to award himself 480,000 units in CTD, valued at $480,000 or more, without consideration and for the purpose of diluting the claims of other members and creditors of CTD, most of whom had paid for their units.  While Marangell apparently contends that his units were "profit participation" shares only, that is untrue; CTD's corporate records clearly show that Marangell's units vested no later than early 2011, making him – at least on paper – the second largest equity holder in the Debtor.  This was done principally to dilute the value of every other equity holder's interest.  In addition, CTD's Operating Agreement did not permit the issuance of "profit participation" shares or any other class of shares other than equity units.

Marangell also worked with Higashi to cause the transfer of CTD's intellectual property and other assets to Spruli just after the conversion of the case to Chapter 7; the plan was for Spruli to exploit CTD's valuable assets (worth upwards of $10,000,000, and with a present value of at least $2,000,000, according to Marangell's own representations) without the burden of CTD's debts and obligations.  Marangell helped Higashi form Spruli, with an absurd initial capitalization totaling only $1,000; thus, Spruli was merely a vehicle, in the view of Higashi and Marangell, for taking over CTD's assets to the detriment of CTD's legitimate creditors.

Marangell committed all the foregoing acts, among others, with actual fraud, and in violation of all the elements of Bankrupty Code Section 548(a)(1).

**C. Eleventh and Twelfth Claims for Relief.**

The Eleventh and Twelfth Claims seek recovery of assets of Debtor wrongfully transferred post-petition, or the value of such assets.

The Trustee's Eleventh Claim is brought against Higashi and the Higashi Entities pursuant to Bankruptcy Code Section 549 to recover unauthorized *post-petition* transfers of Debtor's intellectual property, good will and/or other assets to Spruli. Based on representations made to potential Spruli investors by Higashi and Marangell, the long-term value of the transferred assets was at least $10 to $15 million, with a present value of at least $2,000,000.

The Twelfth Claim seeks recovery against Higashi and the Higashi Entities under Section 549 for the post-petiton loss of inventory of Debtor, and other tangible assets. These assets were appropriated, scrapped and/or sold by Higashi. Based on Higashi's representations, the assets had a value of at least $50,000.

**D. Thirteenth Claim for Relief.**

By virtue of the settlement reached with certain defendants, including Young, the Trustee does not seek any damages on the Thirteenth Claim for Relief. *See* Part IV(B) above.

**E. Fourteenth Claim for Relief.**

In his Fourteenth Claim for Relief, the Trustee seeks recovery against Mr. and Mrs. Higashi and the Higashi Trust for conversion. The claim is based on the Higashis' conveyance to themselves, as trustees of the family Trust, of shares in the Debtor for no, or inadequate, consideration.

Under California law, conversion consists of the wrongful disposition of ownership rights in either tangible or intangible property. *Don King Productions/Kingvision v. Lovato,* 911 F.Supp. 419, 423 (N.D. Cal. 1995). If there is malice, fraud or oppression, punitive damages may be awarded. *In re Butcher,* 200 B.R. 675, 679-680 (Bankr. C.D. Cal. 1996). Punitive damages are recoverable in this proceeding because the transfers were made for the express purpose of diverting assets of the Debtor away from creditors, and to Debtor's insiders.

**F. Fifteenth Claim for Relief.**

The Fifteenth Claim alleges that Higashi breached his fiduciary duties to Debtor and its creditors by transferring millions of dollars of Debtor's assets to himself, his family Trust, and the Higashi Entities. Where an officer or manager of a business entity breaches his fiduciary duty to act in the interests of its creditors, punitive damages are properly awarded under California law. *Cleveland v. Johnson,* 209 Cal.App.4th 1315, 1334 (20120). The Trustee's calculation of damages, including punitive damages, is set forth more particularly in Part VI, *infra*.

**G. Sixteenth Claim for Relief.**

The Trustee's Sixteenth Claim is a request for recovery, for the benefit of the estate, of all tangible and intangible property wrongfully transferred by the defendants; or, alternatively, the value of such property, all pursuant to Bankruptcy Code Section 550(a).

**V. HIGASHI AND THE HIGASHI ENTITIES ARE EACH OTHER'S *ALTER EGOS*.**

Higashi and the Higashi Entities transferred large amounts of money amongst themselves, acted as the personal domains of Higashi, failed to observe even the most basic corporate formalities, and failed to maintain separate or accurate books and records. Under these circumstances, all are jointly responsible for the damages otherwise attributable to Higashi.

Under California law, the conditions under which a business entity may be disregarded, or regarded as the *alter ego* of its equity holders, vary according to the circumstances of each case, because the doctrine is an equitable one, "particularly within the province of the trial court. Only general rules may be laid down for guidance." *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 836-837 (1962). However, the basic requirement for an *alter ego* finding is that there be such unity of interest and ownership that if the acts were treated as those of the business entity alone, an inequitable result would follow. *Id.*

*Associated Vendors* is probably the most widely cited California *alter ego* case, because it sets forth the most common indications of *alter ego*. These include:

- Commingling of assets among entities;
- Entities not maintaining separate books and records;
- Inadequate capitalization;

- Lack of separate books and records;
- Diversion of funds to non-corporate purposes;
- Failure to maintain adequate corporate records;
- Confusion of the records of the separate entities;
- Sharing of location, employees, ownership, control and counsel;
- Failure to maintain arm's length relationships among related entities; or
- The formation or use of a business entity in order to transfer to it the existing liability of another.

210 Cal.App.2d at 240. In cases where *alter ego* has been found,

> "in all instances several of the factors mentioned were present. It is particularly significant that while it was held, in each instance, that the trial court was warranted in disregarding the corporate entity, the factors considered by it were not deemed to be conclusive upon the trier of fact but were found to be supported by substantial evidence." *Id*

In this case, not only "several of the factors mentioned" but virtually *every factor* warrants a finding of *alter ego*.

### VI. DAMAGES AND METHOD OF CALCULATION.

#### A. General Damages.

As evidenced by Debtor's books and records, the following avoidable transfers were made by CTD, and are recoverable as general damages against Higashi, the Higashi Entities and, where indicated, Marangell:

| **Date/description of transfer** | **Amount** |
|---|---|
| 2008: During its first six months of existence, Debtor paid Higashi entities EPX and ITLMC $172,003.32, representing 95% of CTD's initial capitalization. | $172,003 |
| 2008-09: Higashi caused CTD to pay travel expenses for which there was no apparent business purpose. | 39,383 |
| Aug. 2010: Higashi, as manager of both EPX and CTD, caused EPX to | 250,000 |

| | |
|---|---|
| transfer $250,000 from EPX, secured by the assets of CTD. Defendant Marangell, who performed accounting and bookkeeping services for boh entities, was instrumental in the conception and execution of this transfer (as well as the following two transactions). Higashi subsequently returned these funds to EPX. | |
| Dec. 20, 2010: A distribution was made to EPX as a member of CTD for benefit of Higashi, in violation of CTD's Operating Agreement. | 54,000 |
| Late 2010: CTD awarded EPX 50,000 CTD units valued at $3,000 in exchange for intellectual property. On Dec. 24, 2010, Higashi caused CTD to repurchase the same EPX intellectual property. | 8,000 |
| Dec. 2010: Higashi caused CTD to pay $334,000 to him or for his benefit. Funds were debited but there is no reference to check numbers or identity of payees. Marangell played a central role in implementing, facilitating and effecting this transaction; Marangell handled financial matters and banking not only for CTD and EPX but also for ITLMC and ES Design. | 334,000 |
| Dec. 2010: EPX assigned patents to CTD (by means of an assignment docuoment that was backdated to 5/1/08); in addition, CTD referred to a Polycarbonate Polymer patent and apparently exhibited the product at a trade show, but these patents are unaccounted for in the bankruptcy filings or QB records. | 50,000* |
| Marangell received 480,000 free CTD units. Marangell and Higashi constructed a future-vesting compensation plan for thousands of units, but upon making the decision to file for bankruptcy for CTD, they decided to fully vest their units. | 480,000* |
| Early 2011: Higashi awarded himself 600,000 units in CTD, and units in his related entities, without consideration. | 600,000* |
| March 2011: Higashi and Marangell caused CTD to receive $361,768 from existing investors in EPX; and in June 2011, more than $155,000 more. This | 516,768 |

| | |
|---|---:|
| cash disappeared; some was paid to Higashi and/or ITLMC, but the bulk is unaccounted for in CTD's records. | |
| CTD leased and maintained a luxury BMW for Higashi, ostensibly (but never used) as a test vehicle. At CTD's first meeting of creditors, Higashi misrepresented to the U.S. Trustee that the BMW had been used as a test vehicle. CTD derived no benefit. | 100,000 |
| 2010-11: CTD paid for car washes, gas and other expenses for the BMW. | 34,597 |
| January 2011: A CTD ledger entry shows $90,000 credited to Higashi in connection with alleged unit purchase, but the transaction does not appear elsewhere in CTD's QB records. | 90,000 |
| EPX paid ITLMC approximately $500,000 for Higashi's benefit, and without documentary backup. | 500,000 |
| Higashi awarded his family trust 32,000 CTD units, either pre-petition without consideration or post-petition without Court approval. | 32,000* |
| On or about January 25, 2012: Pursuant to a backdated resolution, ES Designtransferred its assets to ITLMC without consideration on the eve of CTD's bankruptcy filing, to permit Higashi to form Spruli, LLC ("Spruli") and take over these assets; Higashi admitted post-conversion that Spruli was pursuing CTD's pulley development. | 10,000,000 to 15,000,000** |
| March 23, 2009: Higashi caused Kuhl Wheels, LLC ("Kuhl") to execute a backdated assignment of its assets to CT Drives and/or ITLMC, to benefit Higashi and to place the assets beyond the reach of an imminent judgment creditor of Kuhl. Disposition of the Kuhl assets is unknown, but a presentation made to Toyota North America by Higashi represented that the technology could be worth more than $20 million per year. | 50,000* |
| Higashi caused CTD to pay for accounting services rendered to other Higashi entities by Perisho Tombor *et al.* | 50,000 |
| Higashi caused CTD to make multiple telephonic and wire transfers for | 976,730 |

which there is no record of the recipients' identity and/or no documentary support for or description of the transfers. In addition, CTD's QuickBooks records show bank deposits in excess of those appearing on Union Bank statements. Also, CTD's QB records show that CTD maintained an account called "12000 – Undeposited Funds" which appears to have been established to either conceal payments or fabricate assets totaling $620,920.53. [Higashi contends that CTD has no hard copies of business records or bank statements, and the QB "audit trail" shows more than 3,000 entries altered on the eve of document production.]

| Description | Amount |
|---|---|
| Higashi improperly paid consulting fees to himself. | 71,000 |
| Higashi/ITLMC billed CTD for "meals" for which there is no accounting backup. | 15,530 |
| Higashi caused CTD to make a payment to an investor five days before the bankruptcy case was ordered converted to Chapter 7, and without authorization. | 8,000 |
| Money was recorded in QuickBooks as deposits to Union Bank, but not reflected by Union Bank statements. | 53,543 |
| Higashi and Marangell caused CTD to pay to Higashi what appear to be mostly unsubstantiated personal expenses. | 63,693 |
| Oct. 20, 2011: On the eve of bankruptcy, CTD (through Higashi and Marangell) assumed and paid liabilities owed by other entities. | 6,713 |
| Oct. 10, 2012: One day after the motion to convert was granted, Higashi took $9,500 out of the Debtor's DIP account. | 9,500 |
| Jan. 11, 2013: Shortly after conversion to Chapter 7, Higashi instructed defendant Young to abandon patents belonging to CTD; Higashi formed Spruli four days later to exploit the patents. The patents were not disclosed to the Court or the Trustee. Higashi acknowledged, in an email to a potential customer, that "[w]e are now called Spruli instead of CT Drives". | 50,000* |

| | |
|---|---:|
| Higashi caused CTD to pay at least $895,000 to ITLMC, ostensibly for management services, and almost entirely unsupported by CTD's books and records. | 895,000 |
| Jan. 2012: Just after conversion of CTD's bankruptcy to Chapter 7, Higashi offered to sell more than $50,000 worth of pulleys; but disposition of the pulleys is unknown. | 50,000 |
| On January 13, 2012, Higashi withdrew $4,500 from CTD's debtor-in-possession account, and apparently caused these funds to be deposited into Young's Union Bank account. | 4,500 |
| CTD paid rent for ES Design, which was owned 45% by CTD; payments were made despite the alleged imminent dissolution of ES Design. There is no evidence in Debtor's records concerning disposition of ES Design's assets. | 19,800 |
| Higashi caused CTD to pay for what appear to be personal expenses (computer, office supplies, employee benefits, etc.) unsupported by any accounting backup. | 292,483 |
| May 13, 2013: CTD assets were transferred to Spruli post-conversion. | 100,000* |
| TOTAL:[2] | $15,279,243 to $20,279,243[3] |

**B. Punitive Damages.**

---

[2] Starred items reflect estimated amounts, for four principal reasons: (a) CTD only produced QB ledgers through April 25, 2012, and Higashi testified that there were no books and records per se after April 25, 2012; (b) CTD made more than 3,000 changes to the QB ledgers on April 24, 2012, the day before production; (c) CTD claims that it has no hard copies of any financial records, but only the (altered) QB files; and (d) defendant Lanlogic, Inc. removed the drives from CTD's servers after conversion of the case to Chapter 7.

[3] Estimated valuation of the assets transferred by ES Design to ITLMC is based on the likelihood that Higashi did or can sell ES Design's polymer spring technology to the highest bidder, at a price along the lines of a multiple of 5 to 7 times profits; profits are conservatively estimated at more than $2.5 million per year.

As explained above, the Trustee is entitled to recover punitive damages on his claims for conversion and breach of fiduciary duty, if the acts in question are found to have been committed with malice, fraud or oppression.

There is no prescribed formula for calculating punitive damages. While the amount to be awarded is largely within the trial court's discretion, the basic criteria for determining the amount of a punitive damages award are well settled. They are:

> "(1) the reprehensibility of the defendant's actions; (2) the amount of compensatory damages, although there is no fixed ratio for determining whether punitive damages are reasonable in relation to actual damages, and (3) the defendant's financial condition." *In re Guillory,* 285 B.R. 307, 316 (Bankr. C.D. Cal. 2002).

The Trustee is prepared to present evidence concerning the defendants' financial condition. While Higashi claims that he is "broke", his Hawaii lifestyle and frequent exotic travel indicate otherwise.

DATED: February 1, 2018

Respectfully submitted,

Peter C. Bronson
LAW OFFICES OF PETER C. BRONSON
A Professional Corporation

By /s/ Peter C. Bronson

Attorneys for Plaintiff Fred Hjelmeset, Chapter 7 Trustee

# PROOF OF SERVICE

I am over the age of 18 and not a party to the within action. My business address is: 770 L Street, Suite 950, Sacramento, California 95814.

On February 1, 2018, I served the following document:

**PLAINTIFF'S TRIAL BRIEF**

on the interested parties in this case as follows:

[X]　**(VIA FIRST CLASS MAIL)**　I placed a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States Mail at Sacramento, California addressed as follows:

**Counsel for Defendants**
William C. Milks, III, Esq.
Law Offices of William C. Milks, III
40 Main Street
Los Altos, CA 94022

[X]　**(VIA EMAIL)**　I transmitted electronically the listed documents to the following email addresses:

William C. Milks, III, Esq. – bmilks@sbcglobal.net

Executed February 1, 2018 at Sacramento, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

　　　　　　　　　　　　　　　　　　　　*(s) Peter C. Bronson*_____
　　　　　　　　　　　　　　　　　　　　Peter C. Bronson