**Entered on Docket**
**July 06, 2018**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



The following constitutes
the order of the court. Signed July 6, 2018

Stephen L. Johnson
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re **CT Drives, LLC**, | Case No. 11-60198 SLJ |
| Debtor. | Chapter 7 |
| **Fred Hjelmeset**, Chapter 7 trustee, | Adv. Proc. No. 13-5154 |
| Plaintiff, | |
| v. | |
| **Wayne K. Higashi**, et al., | |
| Defendants. | |

## ORDER FOLLOWING TRIAL[1]

---

[1] Unless specified otherwise, all chapter and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. Bare "ECF" references are to the docket in this adversary proceeding.

Case: 13-05154    Doc# 168    Filed: 07/06/18    Entered: 07/06/18 11:41:55    Page 1 of 44

## I. INTRODUCTION

Plaintiff Fred Hjelmeset, Chapter 7 trustee ("Trustee"), filed a Complaint for Recovery of Avoidable Transfers, Conversion, and Breach of Fiduciary Duty on October 31, 2013. ECF 1. The complaint came on for trial on February 5, 6, 8, and 9, 2018. Peter C. Bronson, Esq., appeared for the Trustee, defendant Wayne K. Higashi ("Higashi") appeared on his own behalf, and William C. Milks, Esq., appeared for defendant Robert Marangell ("Marangell"). The parties filed post-trial briefs in support of their arguments on March 14 and 28, 2018. ECF 144–150. The Trustee also filed a request to take judicial notice and Higashi and Marangell filed motions to strike. ECF 151–154, 156.

For the reasons stated below, the court finds that (1) any assets transferred to Spruli, LLC ("Spruli") shall be restored to the debtor, CT Drives, LLC ("Debtor"), and (2) $40,000 is recoverable against Marangell as a fraudulent transfer. The Trustee did not met his burden of proof for the remaining causes of action.

The court will enter a judgment in accordance with this decision.

## II. JURISDICTION, VENUE, AND POWER TO ENTER FINAL ORDER

The court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(b), and District Court General Order 24. Venue is proper under 28 U.S.C. § 1408.

The court has authority to enter final orders and judgments in this case. The Trustee's claims to avoid fraudulent transfers are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(H). To the extent that the Trustee's claims are not core proceedings, the parties' active participation in these proceeding after advisement of their right to object constitutes implied consent to the entry of final orders and judgments. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015). Furthermore, the defendants have filed proofs of claim in the underlying bankruptcy case.

## III. SETTLING PARTIES

Rose Higashi was dismissed from this adversary proceeding on June 20, 2016. ECF 117. Other parties settled this dispute with the Trustee following a settlement conference on

ORDER FOLLOWING TRIAL 2/44

June 7, 2017. Those parties include: Thomas L. Bahrick; Barry N. Young; Perisho Tombor Brown, PC; and LanLogic, Inc.

## IV.   DEFAULTING PARTIES

Certain parties have defaulted. These parties include: the Higashi Family Trust; Innovative Technologies Licensing and Management Corporation ("ITLMC"); ES Design, LLC ("ES Design"); EPX, Inc. ("EPX"); and Spruli. The court notes that all of these entities are closely related to Higashi, who was involved in the creation and management of each entity. These entities, as well as Higashi himself, were represented by Mr. Milks until shortly before trial.[2] They did not appear at trial, and they have defaulted.

Pursuant to Fed. R. of Civ. P. 55(b)(2), the court may conduct hearings, commonly called "prove-up hearings," before entering default judgment.[3] The Trustee attempted to prove his case at trial. Following trial, the court declines to enter default judgment. The Trustee has not carried his burden to prove that the defaulting parties have any liability.

## V.   REQUEST FOR JUDICIAL NOTICE AND MOTIONS TO STRIKE

Following post-trial briefing, the Trustee filed a request to take judicial notice, ECF 151–153, and Higashi and Marangell filed motions to strike, ECF 154, 156. Each will be denied in turn.

A.   <u>The Trustee's Request for Judicial Notice</u>

Concurrently with the filing of his post-trial response brief, ECF 150, the Trustee requested that the court take judicial notice of a website "blog" maintained by Rose Higashi, the wife of defendant Higashi. ECF 151–153.

---

[2] Mr. Milks filed an application to withdraw as counsel one week before trial commenced, which the court granted. ECF 133, 134.

[3] "The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2).

ORDER FOLLOWING TRIAL                                                    3/44

Federal Rule of Evidence 201 permits the court to take judicial notice of certain facts.[4] The contents of a website allegedly maintained by an individual who was not a party to the trial, who did not testify, and which was never authenticated or presented in court is wide of the mark. The request is improper, untimely, and inconsistent with the purposes of judicial notice. The Trustee's request for judicial notice is denied.

B. Higashi's Motion to Strike

In partial response to the Trustee's request that the court take judicial notice of Rose Higashi's website, Higashi filed a motion to strike. ECF 154. It consists, essentially, of further argument that Higashi has been manhandled by the legal process and the further contention that the Trustee has made a series of scurrilous comments about Higashi's business methods and family.

The court accepts that these are Higashi's contentions and sees his frustration. The court's determination of Higashi's liability (or non-liability) comes from the evidence offered at trial. The court does not consider post-trial attacks by the parties on each other's methods and credibility. Accordingly, Higashi's motion to strike is denied.

C. Marangell's Motion to Strike

Marangell filed a motion to strike the Trustee's response to Marangell's post-trial brief. ECF 156. He contends that the Trustee did not argue in his opening post-trial brief, ECF 146, that Marangell received a fraudulent transfer. He argues that the Trustee improperly attempted to cure that omission in his responsive post-trial brief, ECF 149. He also argues that the Trustee raised in his responsive post-trial brief a claim that was not set out in the parties' joint pre-trial conference statement, ECF 131, or the Trustee's trial brief, ECF 136.

---

[4] "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

ORDER FOLLOWING TRIAL 4/44

Case: 13-05154    Doc# 168    Filed: 07/06/18    Entered: 07/06/18 11:41:55    Page 4 of 44

Marangell's motion to strike is denied. The complaint's tenth claim for relief alleges that Marangell received "money and/or equity interests" of at least $480,000. Paragraph 29 of the pre-trial conference statement picks up that same language. The matter was discussed at length at trial. The Trustee's failure to discuss it in his opening post-trial brief is not grounds to say the claim does not exist.

## VI. GENERAL FACTUAL BACKGROUND[5]

The Debtor was formed in October 2008 to monetize certain mechanical technologies. Specifically, it sought to license an aftermarket automotive alternator pulley. It found success in this market and a steady income stream. Later, it attempted to further develop its pulley technology so that it could be used by original equipment manufacturers ("OEM"), but its attempts were not fruitful. The Debtor's sources of revenue dried up and it filed for bankruptcy protection after running out of funds to complete development for the OEM market.

The Debtor was associated with several related companies including defendants ITLMC, ES Design, EPX, and Spruli. Higashi appears to have been the chief executive of the Debtor and many of its related companies.[6] Marangell arrived much later to act as accountant or chief financial officer for the operation. He did this as a favor to Higashi, whom he had known for many years through social circumstances and golf.

The allegations in this lawsuit concern how the Debtor was run and financed as well as the disposition of technology it developed before it failed. The Trustee contends that the insiders effectively looted Debtor before it filed for bankruptcy.[7] To summarize, the Trustee alleges that the Debtor's insiders systematically drained Debtor by transferring cash to related companies and individuals, by transferring technology to a new company called

---

[5] This discussion represents the court's findings of fact and conclusions of law. *See* Fed. R. Bankr. P. 7052.

[6] His precise role was never made exactly clear at trial but it was clear, in the vernacular, that he was "calling the shots."

[7] Debtor filed Chapter 11 bankruptcy on November 1, 2011. Debtor's main case was converted from Chapter 11 to Chapter 7 on October 16, 2012. This lawsuit was filed on October 13, 2013.

Case: 13-05154    Doc# 168    Filed: 07/06/18    Entered: 07/06/18 11:41:55    Page 5 of 44

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Spruli, and by awarding themselves and their family "units" in the Debtor. These allegations rely in significant part on the argument that the Debtor and the related companies were "alter egos" of Higashi and therefore are liable with him for his supposed misdeeds. Furthermore, Marangell is alleged to have taken an ownership interest in Debtor to which he was not entitled.

The Trustee's allegations will be discussed individually and in specific detail below.

**VII.    ELEMENTS OF THE TRUSTEE'S CLAIMS**

The Trustee's claims for relief were whittled down somewhat prior to trial. The remaining causes of action include actually and constructively fraudulent transfers, unauthorized post-petition transfers, conversion, breach of fiduciary duty, and recovery of avoidable transfers.[8]

A.    Actually Fraudulent Transfers

Section 548 allows a trustee to avoid actually fraudulent transfers of a debtor's property. Subsection (a)(1)(A) allows the trustee to avoid any transfer that was made within two years before bankruptcy if the transfer was made "with actual intent to hinder, delay, or defraud." In seeking to recover an actually fraudulent transfer under § 548(a)(1)(A), the Trustee has the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991); *Western Wire Works, Inc. v. Lawler (In re Lawler)*, 141 B.R. 425, 428 (B.A.P. 9th Cir. 1992) ("A fair reading of [*Grogan v. Garner*] leads to the inference that the preponderance standard in all bankruptcy proceedings grounded in allegations of fraud."). That is, the Trustee bears the burden to produce evidence and persuade the court that, more likely than not, he has proved sufficient facts to merit recovery.

_____

[8] The Trustee did not provide any legal authority to substantiate the elements of his alleged causes of action, relying instead on generalized characterizations (e.g., "fraudulent transfers" or "breach of fiduciary duty") with naked cites to multiple Code sections (e.g., "11 U.S.C. §§ 544 and 548; Cal. Civ. Code §§ 3439.04–.05," which encompass at least five different possible causes of action). The Trustee also did not apply the testimony or documentary evidence to the elements of each cause of action.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Direct evidence of intent, such as a party's admission that they wished to defraud a creditor, is often hard to obtain. Because of that difficulty, courts consider the circumstances surrounding a transfer to establish whether there was actual intent to hinder, delay or defraud creditors. *In re Wheeler*, 444 B.R. 598, 605 (Bankr. D. Idaho 2011). These circumstances are commonly known as the "badges of fraud." They include indicia such as

> (1) actual or threatened litigation against the debtor;
>
> (2) a purported transfer of all or substantially all of the debtor's property;
>
> (3) insolvency or other unmanageable indebtedness on the part of the debtor;
>
> (4) a special relationship between the debtor and the transferee; and, after the transfer
>
> (5) retention by the debtor of the property involved in the putative transfer.

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 805-806 (9th Cir. 1994). The existence of several of these circumstances can constitute evidence of actual intent to defraud. *Id.* "Once a trustee establishes indicia of fraud in an action under section 548(a)(1), the burden shifts to the transferee to prove some 'legitimate supervening purpose' for the transfers at issue." *Id.* at 806.

B. Constructively Fraudulent Transfers

Section 548(a)(1)(B) allows a trustee to avoid as constructively fraudulent any transfer that: (1) involved property of the debtor; (2) was made within two years of the filing of the petition; (3) for which the debtor did not receive reasonably equivalent value in exchange for the property transferred; and (4) was made when the debtor was insolvent, was made insolvent by the transaction, was operating or about to operate without property constituting reasonable sufficient capital, or was unable to pay debts as they become due. *In re United Energy Corp.*, 944 F.2d 589, 594 (9th Cir. 1991). Reasonably equivalent value is the value of the property on the date of the transfer from the perspective of the creditors. *In re Prejean*, 994 F.2d 706, 708 (9th Cir. 1993); *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125–26 & n.5 (5th Cir. 1993). Courts may consider the fair market value or what would be the fairly

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

equivalent value of the property, taking into consideration all of the specific circumstances of each case affecting the value of the asset. *Hansen v. Cramer*, 39 Cal.2d 321, 245 P.2d 1059 (1952); *Bailey v. Leeper*, 142 Cal.App.2d 460, 298 P.2d 684 (1956).

As with actually fraudulent transfers, the Trustee bears the burden of proof by a preponderance of the evidence on claims of constructively fraudulent transfers. *Grogan v. Garner*, 498 U.S. 279 (1991).

C. Incorporated State Law Fraudulent Transfer Claims

The Trustee may avoid under § 544(b)(1) "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." *In re JTS Corp.*, 617 F.3d 1102, 1109 (9th Cir. 2010). Applicable law includes California's Uniform Voidable Transactions Act ("UVTA") as enacted in Cal Civ. Code §§ 3439–3439.12.

The standards for California UVTA claims are stated slightly differently than those appearing in § 548. They include one actually fraudulent transfer standard,[9] two

---

[9] *See* Cal. Civ. Code § 3439.04(a)(1):

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

ORDER FOLLOWING TRIAL

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

constructively fraudulent transfer standards,[10] and a codified list of badges of fraud.[11] The California UVTA also includes an expanded statute of limitations. While § 548 refers to

_____

[10] *See* Cal Civ. Code § 3439.04(a)(2):

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

*See also* Cal. Civ. Code § 3439.05(a):

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

[11] *See* Cal. Civ. Code § 3439.04(b):

> In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:
>
> (1) Whether the transfer or obligation was to an insider.
>
> (2) Whether the debtor retained possession or control of the property transferred after the transfer.
>
> (3) Whether the transfer or obligation was disclosed or concealed.
>
> (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> (5) Whether the transfer was of substantially all the debtor's assets.
>
> (6) Whether the debtor absconded.

Case: 13-05154    Doc# 168    Filed: 07/06/18    Entered: 07/06/18 11:41:55    Page 9 of 44

transactions within the two-year period before bankruptcy, California's UVTA allows recovery within four years of the transfer date.[12]

The Trustee referenced California UVTA claims in his complaint. But later in his trial brief, the Trustee limited his causes of action for fraudulent transfers to § 548 of the Bankruptcy Code. He stated:

> [T]he Trustee seeks relief based on Section 548 only, on theories of both actual and constructive fraud. The captions . . . referred to California Civil Code Sections 3439.04–.05, but not as additional basis for substantive relief; the Trustee makes reference to California state law solely to confirm that the four-year California statute of limitations applicable to avoidable transfers may be applied, to the extent necessary, to the Trustee's claims.

ECF 136 at 3.

Despite their differences, California's UVTA statute is very similar to § 548. So similar, in fact, that some court have found their elements to be overlapping. *See In re*

---

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

[12] *See* Cal. Civ. Code 3439.09(a)–(b):

A cause of action with respect to a transfer or obligation under this chapter is extinguished unless action is brought . . . :

(a) Under [§ 3439.04], not later than four years after the transfer was made or the obligation was incurred . . . .

(b) Under [§§ 3439.04(a)(2) and 3439.05], not later than four years after the transfer was made or the obligation was incurred.

ORDER FOLLOWING TRIAL

*Solomon*, 299 B.R. 626, 633 (B.A.P. 10th Cir. 2003) ("cases construing the elements under § 548 are persuasive interpretations of the [California UVTA.]"). Indeed, the language of the California UVTA is parallel to that of § 548 in the way that actual and constructive fraud are defined. As a result, the discussion of § 548 below is directly pertinent.

To the extent that the Trustee seeks to apply the four-year limitations period of the California UVTA, the defendants did not dispute the point. Accordingly, the court analyzed the transfers with a four-year limitations period.

D. Unauthorized Transfers

Pursuant to § 549, a trustee may avoid any transfer of estate property that occurs after the bankruptcy case was commenced and that is not authorized by either the Bankruptcy Code or by the bankruptcy court.

E. Conversion

Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the intent of the defendant. Instead, the tort consists in the breach of an absolute duty; the act of conversion itself is tortious. Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial. *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066 (1998).

F. Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty, the plaintiff must allege (1) the existence of fiduciary relationship; (2) breach of a fiduciary duty; and (3) damages proximately caused by the breach of the alleged fiduciary duty. *See Roberts v. Lomanto*, 112 Cal. App. 4th 1553, 1562 (2003); *Tribeca Cos., LLC v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1114 (2015).

**VIII. EVIDENTIARY DEFICIENCIES**

Before discussing each of the alleged transfers individually, the court will discuss some issues that permeate most of the Trustee's case. They include an incomplete body of

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1    evidence, a failure to prove certain elements of the Trustee's causes of action, and the court's

2    rejection of the Trustee's alter ego liability theory.

3          A.   The Evidence Is Incomplete

4          The evidence gathered during discovery and presented at trial is incomplete. Most of

5    the Trustee's allegations are premised on general ledgers and audit trails. Exhibits 1, 4, 6, 7,

6    103, K. The Trustee generated these documents from the Debtor's QuickBooks files. The

7    Trustee frequently argued that Higashi and other defendants did not produce any

8    documentation to support or refute ambiguous line items on the general ledger. He states

9    that the defendants did not produce any other business records during the discovery process.

10   He concludes that the lack of exonerating business records means that the alleged

11   transactions were fraudulent.

12         The court rejects the Trustee's argument, which conflicts with the testimony of

13   Higashi and Marangell. Both stated that extensive business records existed. They spoke in

14   detail about how the Debtor and related companies maintained records. Marangell testified

15   about how he reviewed documentation like the bank records, company bills, and Diner's

16   Club charges to prepare extensive financial projections. He thought he prepared "hundreds"

17   of such projections. He also stated that each companies' records were maintained separately.

18   The exhibits introduced at trial, such as the transaction ledgers and audit trails, suggest that

19   supporting records exist—or at least existed at some point.

20         The disposition of the business records is uncertain. Higashi testified that when the

21   Debtor's business closed, he had a garage full of material related to the company. That

22   material included computers and physical business records. Higashi testified that he

23   repeatedly asked the Trustee to take the material in his garage. The Trustee repeatedly

24   declined, suggesting that the material belonged to secured creditors. Ultimately, the company

25   computers were recycled and the remaining material appears to have been thrown away.

26         The Trustee makes broad allegations that entire classes of transactions are fraudulent

27   because the defendants have not provided evidence to prove their legitimacy. For example,

28   the Trustee complains that transactions described as "telephone transfers" on the Debtor's

ORDER FOLLOWING TRIAL                                                          12/44

bank records are fraudulent because they do not include a transferee name. But the Trustee failed to investigate the transfers' unique reference numbers, did not attempt to identify the recipients, and did not substantiate that the transfers were indeed fraudulent or improper. As discussed below, there are some very simple and consistent explanations provided by Higashi and Marangell's testimony.

To that extent, the court rejects the Trustee's argument that a lack of evidence requires a finding of fraud. To the contrary, the Trustee appears to have neglected to gather and present the evidence necessary to carry his burden of proof. And to the extent that the burden of proof shifted to the defendants, the court is convinced by their testimony as described below. The causes of action were the Trustee's to prove and he largely failed to carry burden of proof. He did not allege that he made extensive document requests in discovery, and he did not introduce any substantial evidence to show that despite such requests, documentation was not provided. Instead, it appears substantial records may have existed, that they were offered to the Trustee, and that the Trustee failed to secure them. On that basis, the court cannot conclude that the defendants are somehow responsible for producing evidence to rebut the Trustee's allegations.

B.  The Trustee Did Not Present Evidence of Reasonably Equivalent Value

A claim alleging that a transfer was constructively fraudulent requires proof that the transfer was for less than "reasonably equivalent value." § 548(a)(B)(i). *Cf.* Cal. Civ. Code §§ 3439.04(a)(2), 3439.05(a). An important flaw in the Trustee's case is the failure to produce substantial and convincing evidence of the value received in connection with many of the transfers.

For example, the Trustee alleges that valuable technological intellectual property was transferred from the Debtor to Spruli, but there is no evidence to substantiate the value of that technology. The testimony at trial was that the development of an OEM alternator pulley was completely unsuccessful, and Spruli is now defunct. The court is not convinced that the technology has any value whatsoever, much less the $5 million to $20 million valuation alleged by the Trustee.

ORDER FOLLOWING TRIAL                                                          13/44

1     Another example is the lack of evidence regarding the value of ownership shares in

2 the Debtor. The Trustee alleges that Higashi, Marangell, and EPX purchased ownership

3 units in the Debtor at prices below what other individuals paid. But the Trustee has not set

4 forth any evidence regarding the reasonable price of shares, how the price might have

5 changed over time, and how the price might be negotiated higher or lower depending on

6 what is being received in return (e.g., consulting services). Furthermore, because the

7 Debtor's creditors will be paid before any of its equity holders, they are not damaged by

8 shares being issued at a discount. And if the creditor's claims exceed the bankruptcy estate's

9 assets, then the shares are presumably worthless.

10     In short, the Trustee has not provided any evidence to show the value of transferred

11 property, or that it was transferred for less than equivalent value. Without evidence that the

12 alleged transfers were not for reasonably equivalent value, I cannot conclude they were

13 constructively fraudulent.

14     C.  <u>The Court Rejects the Trustee's Alter Ego Theory Allegations</u>

15     The Trustee argues that Higashi and each of the related entities (the Higashi Family

16 Trust, ITLMC, EPX, ES Design, Spruli, Marangell, etc.) are alter egos that should be held

17 jointly and severally liable. I am not convinced based on the evidence presented at trial.

18 Higashi and Marangell both testified about the companies, the differing roles they played,

19 and how they interacted.

20     The companies had different businesses: EPX was the inventor of patented

21 technology described as a "mechanical diode one-way clutch"; the Debtor was involved in

22 developing and marketing an aftermarket decoupler pulley using EPX's technology; and ES

23 Design was intended to manufacture springs for the decoupler pulley. ITLMC acted as a

24 manager or parent for the other companies. It paid the majority of expenses and was

25 reimbursed by the other entities. The related companies also paid ITLMC a management fee,

26 which principally covered ITLMC's management functions and the services of Higashi.

27 Later, when the Debtor became the only financially viable stand-alone entity, Marangell

28 altered the companies' financial system. After late 2010, the Debtor and its sister companies

ORDER FOLLOWING TRIAL                14/44

incurred most of their expenses directly. ITLMC was left as a holding company to retain assets of companies that had been wound up.

The Trustee alleges that Higashi exercised control over the entities and comingled funds. But I find that the testimony of Higashi and Marangell, as well as the documentary evidence, adequately explains the corporate structure and does not support a finding of alter ego liability. To be clear, the system of payment and reimbursement was not completely explained at trial, but the court is not convinced that funds were improperly comingled or the companies were not treated as separate entities. Rather, it seems that the defendants went to great lengths to respect corporate formalities and the individual corporate identities. The court does thereby rejects the Trustee's allegations of alter ego liability.

D. <u>The Trustee Proved the Debtor's Insolvency, but Did Not Prove Other Measures of Financial Condition</u>

1. *The Trustee Proved That the Debtor Was Insolvent*

The Trustee's evidence that Debtor was insolvent was thin but uncontested. At bottom, the Trustee relied on a single document: a bar chart that summarizes the Debtor's net worth every month during a four year period ending in April 2012. Exhibit 97. It was prepared by the Trustee from the Debtor's QuickBooks files. Generally speaking, the chart shows that the Debtor's liabilities exceeded its assets during this time frame. The Trustee argues this is proof of insolvency. Without evidence or argument to the contrary, I accept this conclusion.

The Trustee can therefore support this element of a claim under § 548(a)(1)(B)(ii)(I) and Cal. Civ. Code § 3439.05(a).

2. *The Trustee Did Not Prove That the Debtor Engaged in Business with Unreasonably Small Capital*

At trial, both Higashi and Marangell testified about efforts they took to minimize expenses to sustain the Debtor's efforts to development an OEM pulley. The Trustee presented no evidence about what sort of capital requirements control in an industry such as

ORDER FOLLOWING TRIAL                                                                 15/44

Case: 13-05154    Doc# 168    Filed: 07/06/18    Entered: 07/06/18 11:41:55    Page 15 of 44

the Debtor's. The company shut down when it ran out of funds, but I do not have material evidence that suggests that the Debtor's capital was unreasonably small.

The claims register obviously shows the many claims filed in the Chapter 11 case. Some of these many of these claims appear to be related to contractual disputes, but these claims were not discussed at trial (e.g., the claims of Positork, Inc. and Conntechnical Industries, Inc.). Most claims are relatively small and held by secured creditors (many of them are listed on the schedule of equity security holders).

Under the circumstances, it is not possible to conclude with any confidence that the Debtor operated with unreasonably small capital. The Debtor's executives testified convincingly that the company struggled from a financial perspective. But they did what they could to reduce costs and extend its attempt to develop an OEM pulley.

The Trustee cannot support this element of a claim under § 548(a)(1)(B)(ii)(II) and Cal. Civ. Code § 3439.04(a)(2)(A).

### 3. *The Trustee Did Not Prove That the Debtor Intended to Incur Debts Beyond Its Ability to Pay*

The testimony at trial covered much about Debtor's business and its attempts to develop a pulley system for sale on the OEM market. Both Higashi and Marangell testified about the extensive efforts made to find financing to fund that project. The court heard testimony about the Debtor's myriad challenges, including disputes with Connard Cali ("Cali") and AIM's failure to pay licensing fees it had agreed to. But there was also testimony about cost-cutting measures such as a move to cheaper space, insiders forgoing salaries, the return of a leased BMW vehicle, and Marangell's agreement to work for an ownership interest rather than pay. Both Marangell and Higashi testified that Debtor paid claims currently to the best of its ability and the company folded when the money ran out. Higashi advanced money to the company from his personal funds. The company sought additional investors. Higashi attempted to reorganize the balance sheet by converting some unsecured debt to secured debt with longer terms.

ORDER FOLLOWING TRIAL

16/44

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1    Given the extensive measures undertaken to reduce costs, the court cannot conclude

2   that the Debtor intended to incur debts beyond its ability to pay. Therefore, the Trustee

3   cannot support this element of a claim under § 548(a)(1)(B)(ii)(III) and Cal. Civ. Code

4   § 3439.04(a)(2)(B).

5        E.   The Trustee Failed to Identify Whether Claims Were in Existence at the Time of

6             the Alleged Transfers

7        Proof of insolvency, unreasonably small capital, an intent to incur debts beyond an

8   ability to pay can support a finding of a constructively fraudulent transfer under

9   § 548(a)(1)(B). California law provides a slightly different standard. *See In re Tenorio*, 2018 WL

10  989691, at *7 (B.A.P. 9th Cir. Feb. 8, 2018). Under Civil Code § 3439.04, which applies to

11  transfers made before or after a debt is incurred, this means that the plaintiff must show the

12  transferor was about to engage in business with unreasonably small capital or intended to

13  incur debt beyond its ability to pay. Under Civil Code § 3439.05, which applies only to

14  transfers which took place after a claim was incurred, the plaintiff must show the transferor

15  was insolvent. As to present creditors, the Trustee can avoid transfers that result in

16  insolvency. Thus, the Trustee must prove the transfer was made without the Debtor

17  receiving reasonably equivalent value *and* when it was insolvent. *See* 8 Witkin, Cal. Procedure

18  (5th), Enforcement of Judgments §§ 496-97 (distinguishing § 3439.04 claims that were

19  incurred before or after a transfer from § 3439.05 claims that arose before the transfer

20  § 3439.05).

21       This analysis requires the court to consider whether particular creditors rights were

22  vitiated by specific transfers the Debtor made. To do that, I would need to see which

23  creditors have claims and when those claims were incurred. I would then be required to

24  compare them to asserted transfers. *See In re Tenorio* at *7 (identifying which cause of action

25  under §§ 3439.04 and 3439.05 applies is based on date of alleged incurrence of debt).

26       The Trustee has not introduced substantial evidence on these points and instead

27  relies on a generalized conclusion that many of the transfers that the Debtor made were

28  fraudulent. The Trustee makes this analysis challenging because he failed to identify which

ORDER FOLLOWING TRIAL                                                              17/44

creditors' claims were incurred without an intention to repay them. He did not refer to the claims in reference to future or existing debts. Indeed, the Trustee did not enumerate a single debt that remains unpaid. Accordingly, I cannot find that the Trustee has met his burden of proof as to existing or future creditors.

## IX. HIGASHI AND RELATED COMPANY TRANSFERS

In his opening post-trial brief, ECF 146, the Trustee contends that a number of transfers are recoverable. The Trustee does not precisely link each transfer to a specific legal theory (e.g., whether a specific transfer is alleged to be actually fraudulent under § 548(a)(1)(A) or constructively fraudulent under § 548(a)(1)(B), etc.), so I have attempted to marry the allegations to the most likely causes of action. The transfers discussed below largely track the Trustee's opening post-trial brief, ECF 146.

### A. Union Bank Telephone Transfers

The Trustee states in his opening post-trial brief that

> Higashi testified that the only two places where financial transactions of CTD were recorded were its QuickBooks ledger [Exh. 1] and its Union Bank statements [Exh. 3]. The Union Bank statements showed the dates and amounts of "telephone transfers" made from July 2008 through September 2012. Higashi admitted that the bank statements did not show to whom any of the transfers were made. The Union Bank statements show a total of $231,662.06 in telephonic transfers lacking any ledger backup. [Exh. 3 at 6, 10, 12, 14, 16, 18, 20, 24, 26, 28, 34, 36, 62, 64, 66, 70, 74.]

The Trustee alleges that the transfers are fraudulent because the relevant bank statements line item entries fail to name a recipient. It is worth examining a few of these entries to demonstrate the problem presented in identifying them properly. The first is found at Exhibit 3, page 6. It states, in its entirety,

| Date | Description | Reference | Amount |
|------|-------------|-----------|--------|
| 7/9 | TELEPHONE TRANSFER | 99351734 | 25,000.00 |

Other examples include these, from page 10 of the same exhibit,

| Date | Description | Reference | Amount |
|------|-------------|-----------|--------|
| 9/3 | TELEPHONE TRANSFER | 99351592 | 37,078.68 |
| 9/17 | TELEPHONE TRANSFER | 99351629 | 9,247.81 |

Case: 13-05154    Doc# 168    Filed: 07/06/18    Entered: 07/06/18 11:41:55    Page 18 of 44

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The bank statement line item entries are marked as "TELEPHONE TRANSFER." They do not name specific recipients, but they do contain unique reference numbers. The Trustee did not investigate those reference numbers.

The lack of recipient names on bank statement entries does not support the conclusion that these items were actually or constructively fraudulent transfers. The Trustee did not prove any intent to hinder, delay, or defraud. He did not identify the recipients and makes no effort to distinguish between legitimate and fraudulent transfers, rather arguing that all of the telephone transfers are fraudulent.

Given the somewhat complicated management and financial structure of the Debtor and the related companies, these transfers may be legitimate payments and reimbursements between the corporate entities. The testimony at trial suggests that it is possible that much of this money was transferred to ITLMC. ITLMC and the Debtor had a symbiotic financial relationship. ITLMC employed the people who worked at the Debtor and the related companies. Those expenses were allocated to the members of the group. In addition, ITLMC was paid a flat fee of $50,000 per quarter in compensation. The evidence at trial indicated that the related companies, including Debtor, routinely reimbursed ITLMC for expenses paid on their behalf. They reimbursed ITLMC for employee expenses and for other costs. Thus, it is at least equally likely the identified transfers were intended as reimbursements for actual expenses incurred.

The fact that the QuickBooks files themselves do not reflect backup for such transfers could be explained by the fact that ITLMC paid the original bills and only sought reimbursement from the Debtor and the other companies. In other words, there is an even chance that the documentary backup for these charges were not maintained by the Debtor but by ITLMC. Moreover, the QuickBooks files that were introduced into evidence are nothing more than a list of accounting entries in a computer system. It is not my experience that such entries contain backup information like bills, invoices, and spreadsheets because they are simply accounting summaries.

ORDER FOLLOWING TRIAL                                                    19/44

In any event, it is worth noting what is missing here. The Trustee is relying on bank records. The records contain a reference number. Surely a bit of detective work (and discovery) could have helped the Trustee to ascertain how these transfers came to be, whether they were authorized, and who received them. In effect, the Trustee seeks a determination that these transfers are categorically improper but he has not proven that is so. Having failed in this respect, the Trustee has not met his burden of proof.

B. $400,000 Paid to EPX

The Trustee alleges in his opening post-trial brief that

> CTD's general ledger shows that CTD paid more than $400,000.00 to defendant EPX, Inc. ("EPX") between September and December 2010; Higashi said he had no understanding of these transactions but assumed that they occurred, because the general ledger said they had occurred. Likewise, he had no explanation for the December 20, 2010 ledger entry that stated that EPX received "50,000 A units @ $0.06 per unit". [Exh. 85.]

Higashi and Marangell both testified extensively and consistently about transfers between the Debtor and EPX. EPX was in a stronger financial position than the Debtor in 2009 to 2011 and provided financing to the Debtor. The evidence (Ex. DD) showed that in 2009, EPX paid $48,200 to the Debtor. It provided an additional $30,000 in cash from January to August 2010. And, from December 2010 to January 2011, EPX's former shareholders rolled their investments in EPX into the Debtor.

One transaction alone sheds light on the $400,000 figure. In the last quarter of 2010, the relationship between an individual named Connard Cali and the Debtor (and its principals) became extremely difficult. At this stage, EPX was being wound down because its source of revenue, royalties from a license, was coming to an end. Marangell testified that EPX was the only one of the related companies with substantial cash assets. Higashi attempted to negotiate an agreement by which Cali would no longer have any business relationship with the Debtor. To that end, he agreed to pay Cali $250,000. Debtor borrowed most of the money to pay Cali from EPX and gave EPX a note. That deal fell apart for reasons that were never clarified at trial. Afterwards, the Debtor returned the money to

ORDER FOLLOWING TRIAL                                             20/44

EPX. Marangell also testified that Debtor reimbursed $30,000 to EPX for the salary of an employee named Mr. Fitz.

Higashi's inability to explain an entry in the books showing that EPX received 50,000 "A units" in exchange for $0.06 per unit does equate to a fraudulent conveyance. Creditors are not damaged when someone receives stock from a company because their claims always have priority over shareholder interests. The Trustee might argue that these shares were issued at a discount and that the Debtor received less paid in capital than should have been contributed. This argument, to the extent the Trustee makes it, seems more like a failure to contribute capital than a fraudulent conveyance. Such a transaction, if it occurred, might be improper but the court has not been supplied with any authority for the proposition that it constitutes a fraudulent conveyance. In any event, it is likely that record is in error: Debtor's List of Equity Security Holders, Exhibit 16, does not reflect EPX as a shareholder.

### C.  $8,000 Bank Withdrawal

The Trustee alleges in his opening post-trial brief that

> On October 4, 2012, with the hearing on conversion just five days away, Higashi withdrew $8,000.00 from the D.I.P. account, and paid it to creditors Laurence and Anna Marie Boucher without justification. [ATT I: 4:11:45; Exh. 3 at 131; Exh. 41.]

The evidence at trial does not support a conclusion this transaction was "without justification." Exhibit 41 is a copy of Debtor issued check dated October 4, 2012, made payable to Laurence and Anna Marie Boucher, in the amount of $8,000. Higashi testified that he authorized this payment. He stated that the Bouchers invested $10,000 in Debtor and then had second thoughts. They informed Higashi they did not want to make that investment. Higashi agreed to pay the Bouchers $8,000 to settle this matter. The notation on the check reads, "Partial Return of Note Purchase."

This transfer cannot constitute a fraudulent conveyance for the simple reason that it took place *after* the bankruptcy case was filed and, in fact, after it was converted to chapter 7. Section 548(a) states that transfers "made or incurred on or within 2 years *before* the filing of the petition" may be recoverable (emphasis added).

Case: 13-05154    Doc# 168    Filed: 07/06/18    Entered: 07/06/18 11:41:55    Page 21 of 44

The transfer might constitute an unauthorized transfer of estate assets under § 549. The transfer took place after the bankruptcy case was filed and does not appear to have been authorized by the court. It also does not appear to be an ordinary course transaction within the meaning of § 363. However, the complaint did not make a § 549 allegation about this transfer. The complaint's § 549 transfers only address issues involving Spruli (Count Eleven), inventory (Count Twelve), and those to Barry Young (Count Thirteen).

Finally, the transfer of $8,000 was not made to Higashi or any of the other named defendants, but to the Bouchers. It seems clear that the most likely party defendant on such an action would be the Bouchers.[13] The Trustee did not introduce any evidence to show the transfer benefitted any of the defendants.

Accordingly, this claim fails as a matter of fact.

D. $4,500 Cash Withdrawal

The Trustee alleges in his opening post-trial brief that

> The Union Bank statements established that on January 13, 2013, shortly after the case had been converted to Chapter 7, Higashi personally withdrew $4,500.00 from CTD's still open Debtor-in-Possession account. [Exh. 3 at 128-129.]

This transfer cannot be a fraudulent conveyance because it occurred *after* the bankruptcy case was filed. As noted, § 548(a) states that transfers "made or incurred on or within 2 years *before* the filing of the petition" may be recoverable (emphasis added).

The complaint includes, as noted above, several causes of action for unauthorized transfers, but these were restricted to selected transactions with third parties. They do not cover this situation.

Count Fourteen, on the other hand, includes a claim for conversion which might apply to a postpetition transfer that was unauthorized. The evidence at trial showed that on January 13, 2013, Higashi made a cash withdrawal of $4,500 from Debtor's account at Union Bank. (Ex. 3, p. 129). There was no testimony on this point. The Trustee obviously wants

---

[13] The Bouchers appear as 2.88% shareholders on Exhibit 16 with the notation "TTEES." The court not aware if this is the same shareholder interest referenced above.

Case: 13-05154   Doc# 168   Filed: 07/06/18   Entered: 07/06/18 11:41:55   Page 22 of 44

the court to draw an inference that money taken from an account in this fashion has been stolen because California law requires a finding of "conversion by wrongful act" for the Trustee to prevail. But the court has no idea why the money was taken and how it was disposed of. This question might have been clarified if Higashi was examined about this point at trial. But he was not. The Trustee has not met his burden of showing the transaction was wrongful.

The action might also be covered by Claim Fifteen, Breach of Fiduciary Duty. That claim names Higashi personally. For the same reasons, I find that The Trustee has not met his burden of proof. Higashi was an officer of the Debtor, and he certainly took cash from the Debtor post-conversion. But no evidence was introduced about this transfer other than its occurrence. Both Higashi and Marangell testified extensively about how Debtor conducted its affairs, its relation to the other companies, and its financial transactions. Higashi, who was still operating Debtor at the time of the transfer, would certainly have been able to describe this transaction. At a minimum, the court would want to know what happened with the money. Without a proper factual record I cannot find the taking of the money was a breach of duty.

E. $172,003.32 Paid to EPX and ITLMC

The Trustee alleges in his opening post-trial brief that

> During its first six months of existence, CTD paid EPX and defendant Innovative Technologies Licensing and Management Corp. ("ITLMC") $172,003.32. [Exh. 1, account no. 1011, transaction nos. 6, 64, 82, 85, 87, 107, 111, 112, 123, 124, 126, 134, 136, 148, 149.]

The Trustee argues that $172,003.32 is recoverable from EPX and ITLMC but offers no specific legal justification for doing so. It is arguable that he contends these transfers were fraudulent within the meaning of § 548 but the Trustee does not expressly say so.

This claim is barred by the statute of limitations. Debtor began business on October 1, 2008, so four years later would be October 1, 2012. The complaint was filed October 31, 2013, a year too late. *See* Cal. Civ. Code § 3439.09(a) and (b).

Case: 13-05154    Doc# 168    Filed: 07/06/18    Entered: 07/06/18 11:41:55    Page 23 of 44

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

As noted previously, the Debtor, ITLMC, and EPX had complicated relationships. ITLMC was best described as a parent and management company. At least initially, it employed personnel and paid expenses. Those employees and expenses were later allocated to the operating entities like the Debtor. The operating companies were charged with those expenses and later reimbursed ITLMC. At times, too, EPX provided monetary support for the Debtor. Much later, Debtor emerged as the only operating entity of the group and paid all expenses directly. Extensive oral testimony was received on these points from both Higashi and Marangell.

The only documentary evidence at trial about these transactions came in the form of Exhibit 1, a document entitled "Transaction Detail by Account." It was generated from Debtor's QuickBooks accounts. It is neither useful nor persuasive. It is voluminous, with approximately fifty entries on each of its 95 pages. The entry descriptions are severely truncated. By example, several transactions the Trustee alleges are fraudulent are hard to identify (e.g., "Q4 2008 Opera," "December 200," "Op expenses," and "Reimbursement").

I cannot find that each and every one of the payments specified is improper. The titles alone suggest otherwise. "Reimbursement" suggests money being paid back to cover an expense, as was described by both Higashi and Marangell. "Op expenses" suggests the same thing. And "Q4 2008 Opera" might even be the quarterly payment due to ITLMC under the companies' operating procedures. Indeed, on $25,000 check is referenced to be paid to "Management Co" and the testimony at trial indicated that "Management Company" was ITLMC.

The Trustee argued at trial that the absence of records to support these entries proves they were unfounded. In this, the Trustee conveniently overlooks the testimony of Higashi and Marangell that goes a long way to explaining how such payments might have been possible. More important, the Trustee failed to collect and investigate all of the available evidence. Both Higashi and Marangell testified that records existed to support the payments reflected in the general ledger from which Exhibit 1 was derived. Furthermore, Higashi

ORDER FOLLOWING TRIAL

stated that there were business records in his garage and the Trustee did not wish to pay to store or retrieve them.

There are many ways to prove a payment shown in a general ledger is wrongful. Pointing to an adverse party's failure to produce the evidence is generally not one of them. The Trustee has not met his ultimate burden of proof to show that these payments were wrongful.

F. Travel Expenses

The Trustee alleges in his opening post-trial brief that

> Higashi caused CTD to pay travel expenses totaling $39,383.00. The general ledger does not contain any backup or disclose any business purpose for these expenses. CTD and its counsel represented that there were no "hard copy" documents (such as receipts or bills) that would support any entries in the general ledger.

As an initial matter, nowhere in the trial record did the Trustee identify precisely $39,383.00 in travel costs. As a matter of fact, the trial did not include any substantial discussion of travel costs, except in connection with the formation of Spruli. Both Higashi and Marangell discussed travel they undertook in attempting to design a spring that met manufacturer's original equipment specifications before the demise of the Debtor.

At trial, the court heard substantial evidence about meetings that the Debtor was attempting to arrange with companies on the market for OEM products. A number of emails were introduced involving third party companies interested in discussing the project and possibly meeting with the Debtor's team. Thus, there was some evidence at trial of the need for the Debtor's employees to travel.

Higashi was questioned about the existence of receipts for an accumulated total of $15,000 in meals, which the court presumes is part of the complained-of travel costs. He stated, "There certainly were. I don't have access to them now. We had receipts for every meal in our files." Transcript at 147:20–21. Moreover, Marangell stated he reviewed Diner's Club records as part of his work. He said

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

> I went through the monthly Diners Club credit card statement to allocate the expenses that were in there to wherever they appeared to be appropriate. Once I had done all of the basic analysis and reconciliations, I would then—posting entries to both ITLMC and CT Drives, and then record whatever accounting accruals or adjustments were required to complete the statements.

Transcript at 439:4–10.

The Trustee has not identified precisely which expenses comprise the $39,383.00 in allegedly fraudulent travel charges, so it is not possible to review the precise charges that the Trustee has challenged. I heard testimony from the officers and employees that there were records to support these charges and that much of it was spent on meals. On this basis, I cannot make a categorical determination that the charges represent fraudulent transfers.

G. $620,000 in Missing Assets

The Trustee alleges in his opening post-trial brief that

> CTD's general ledger shows $620,000.00 in "assets" under account number 12000, titled "undeposited funds". Higashi could offer no explanation for this account, or the source or disposition of the $620,000.00. [ATT II, 0:54:30.]

This entry does not appear to be a transfer so cannot support a determination that it is recoverable under § 548(a). The only reference to this transaction at trial was as follows:

> Q.    [Bronson] There is an account called 12,000 dash Undeposited Funds that appears throughout the QuickBooks records; do you know what that is?
>
> A.    [Higashi] No.
>
> Q.    Do you have any idea why CT Drives QuickBooks records would include an undeposited funds account showing assets of $620,920?
>
> A.    No.

Transcript at 180:23–181:4.

This entry, "Undeposited Funds," could mean virtually anything. Without proof that funds somehow left the Debtor's accounts, a general ledger notation cannot constitute a basis for concluding that funds have gone missing.

ORDER FOLLOWING TRIAL

H. Higashi Family Trust Failed to Pay for Units in the Debtor

The Trustee alleges in his opening post-trial brief that

> In December 2009, at a time when CTD needed cash, Higashi sold 150,000 units in CTD to his own family trust for $1 per share ($150,000) [III: 4:43:20]. At that point in time, all other investors were being charged $2.50 per share [III: 4:42:20; Exh. E at 74-75], so Higashi's self-dealing transaction cost CTD and its creditors $225,000.00 in badly needed cash.

This claim is very similar to the claim regarding EPX's receipt of 50,000 "A units" in exchange for $0.06 per unit. It does not amount to a fraudulent conveyance. To repeat: Creditors are not damaged when someone receives stock from a company. Their claims always have priority over shareholder interests. The Trustee might argue that these shares were issued at a discount and that the Debtor received less paid in capital than should have been contributed. Indeed, the Trustee argues other investors paid $2.50 per unit.

The evidence at trial indicated that the Higashi Family Trust paid $150,000 for 60,000 shares in Debtor. Exhibit E at 75. Moreover, Marangell testified that the Higashi Family Trust contributed $150,000 to Debtor. Transcript at 464:7–13.

This argument, to the extent the Trustee makes it, seems more like a failure to contribute capital than taking an asset out of the estate. The court has not been supplied with any authority for the proposition that such a transaction constitutes a fraudulent conveyance.

I. Debtor Borrowed $250,000 from EPX

The Trustee alleges in his opening post-trial brief that

> In September 2010, Higashi caused EPX to lend CTD $250,000.00 on an urgent basis, ostensibly for the purpose of having money on hand in the event that CTD was able to reach a settlement regarding the claims of Conntechnical Industries ("Conntechnical"). No settlement was reached. Although the note was not yet due, Higashi caused CTD (which was desperately short of cash) to repay the note to EPX, whose investors then used it to purchase more units in CTD. [Exh. 11; ATT II: 00:03:50 et seq.]

This transaction is discussed as part of the $400,000 transfer discussed above. For the reasons indicated, it was not proven to be a fraudulent transfer.

ORDER FOLLOWING TRIAL                                                    27/44

J.   Unauthorized Payments to EPX

The Trustee alleges in his opening post-trial brief that

> On December 20, 2010, Higashi caused payments in the
> amounts of $54,000 and $80,128 to be made to EPX in
> apparent violation of the CTD operating agreement. [Exh. 1,
> transaction nos. 265, 268; Exh. 73 at section 11.5.]

Exhibit 73 is the Debtor's operating agreement, and section 11.5 describes
distributions. This indicates that the Trustee alleges an improper distribution was made by
the Debtor, a limited liability corporation. The Trustee's argument is not consistent with the
testimony at trial. Marangell testified that Debtor was short of cash and that EPX lent
Debtor funds. Indeed, as discussed above, Debtor borrowed $250,000 from EPX to pay a
proposed settlement to Cali. Thus, it appears more likely that Debtor was reimbursing EPX
for funds that it lent Debtor. No substantial proof was introduced at trial to indicate these
payments were "distributions" within the meaning of the Debtor's operating agreement.

K.   $339,238 Paid to Higashi

The Trustee alleges in his opening post-trial brief that

> In December 2010, Higashi caused CTD to pay $339,238.00 to
> him or for his benefit; the payments are shown on CTD's
> general ledger, but there is no reference to check numbers or to
> the identity of the payees. [Exh. 1, account nos. 1011, 1013.]

I do not find evidence of these transfers in the noted Exhibit 1. Each page of that
exhibit, as noted above, has more than fifty entries a line. It is 95 pages in length. There are
approximately five thousand entries, and they are not in numerical order. Without a clearer
reference, these entries are simply unsubstantiated.

Additionally, Higashi was employed by, and received compensation from, the
companies. It is not at all unsurprising that he received payments from the Debtor. I would
note in having carefully reviewed many line items that Higashi is not the named payee in any
payment that I found. ITLMC and other related companies are certainly payees, however. I
would also note that Exhibit 6 shows that some entries have been altered such that Higashi
may have been a payee on some items that were subsequently changed to ITLMC or

ORDER FOLLOWING TRIAL

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Management Company. But the entries that name Higashi are a small minority of the payments.

### L.  $155,553.79 in Unaccounted Investor Funds

The Trustee alleges in his opening post-trial brief that

> According to CTD's Schedule D (Exh. 26), in mid- to late 2011 it received $155,553.79 from investors; but the disposition of such funds is not accounted for in the general ledger. Higashi testified that if the transactions were not accounted for in the general ledger, there was no way to ascertain who received these payments or why they were made. [ATT II: 0:51:45.]

It is difficult to determine the precise nature of the allegation. The Trustee seems to be arguing that before the bankruptcy case was filed, individual investors paid $155,553.79 to the Debtor and that the disposition of those funds is not clear. If that is the argument, I assume the Trustee means that funds have been taken out of the Debtor and are unaccounted for. This might qualify as a fraudulent conveyance under some circumstances.

The difficulty with finding these supposed payments to be wrongful is that the Trustee has not provided any substantial evidence to support their existence. If he is saying money is missing, there must be a culprit in the scheme who took the money. Otherwise, there is no party defendant. I would note, too, that both Higashi and Marangell offered extensive testimony to show their efforts to keep Debtor financially viable while working to finish the OEM pulley project. Marangell himself lent $10,000 to Debtor. Exhibit U. It is natural to assume that if Debtor had an extra $155,553.79 available for that project, it would have used it to further the research. Both of them testified at the complex process they used to keep the Debtor from running out of money. I cannot find on this record that money is missing nor can I find that some unstated person is responsible for that.

### M.  BMW Lease

The Trustee alleges in his opening post-trial brief that

> Higashi caused CTD to lease a luxury BMW sedan, supposedly as a test vehicle but used only by Higashi for personal purposes. [ATT I: 4:08:04; Exh. 35.] CTD paid at least $35,734.38 in auto expenses, all recorded under "travel and entertainment". [ATT II 2:52:45; Exh. 1 at 92, account no. 7390.] These expenses

ORDER FOLLOWING TRIAL

Case: 13-05154   Doc# 168   Filed: 07/06/18   Entered: 07/06/18 11:41:55   Page 29 of 44

included car washes, gas, and other outlays. [Exh. 1, account nos. 1011, 5240, 7260, 7310, 7350, 7390; ATT I: 4:25:56.] Higashi testified that even had the BMW been a suitable test vehicle, it would have been necessary to connect CTD's pulley to the alternator; it seems unlikely, to say the least, that BMW would have countenanced modifications being made to its leased luxury car. Further, the items found in Higashi's garage after the conversion to Chapter 7 included a minivan chassis that had been used as a pulley test stand; this makes it clear that the BMW was a personal vehicle for Higashi, and the minivan chassis was the test stand. [ATT II:01:15:00; Exh. 72 at Exh. A, p. 3.]

The contention is that Higashi improperly and fraudulently received the benefit of a luxury vehicle. But this does not square with the evidence presented at trial.[14] Higashi testified that ITLMC leased this car and he personally guaranteed the lease. It appears that the Debtor reimbursed ITLMC for the lease payments, which were approximately $1,700 per month according to Marangell. In 2010, the costs totaled $16,714 and in 2011, $11,897. Transcript at 588:16-17.

The vehicle was not intended as a personal vehicle for Higashi at the time of acquisition. The vehicle was driven by Higashi. But it was leased, at least in part, because it had a regenerative braking system that interacted with the alternator. Higashi stated that Connard Cali encouraged him to lease *this specific model* of vehicle because it was the only passenger vehicle on the market in 2008 with that capability. In this way, it could be used as "test bed" for the Debtor's OEM pulley system. The Trustee argues that BMW would not have authorized modifications but he introduced no evidence of that. Higashi is an engineer and Cali approved the modifications to the vehicle. Higashi was the only witness to address this point, and he seemed unconcerned about any objection BMW might have. The vehicle was never used as a test bed because, as Higashi testified, Debtor's OEM pulley system never proved workable. In 2011, the company returned the car to BMW to conserve cash. No contrary testimony was presented.

In essence, the Trustee argues that the Debtor leased a vehicle for its chief officer, and that this amounts to a fraudulent conveyance, conversion, or breach of his fiduciary duty

---

[14] The lease was not introduced into evidence, but the court considered the application to lease the vehicle. Exhibit 35.

ORDER FOLLOWING TRIAL

to the company. I do not find the lease of the vehicle and the company's payment of its costs is any of these things. The uncontroverted testimony was that the vehicle was leased due to specific characteristics. The cost was not outrageous. It was used by the company's principal until it was returned to the leasing company when the Debtor's financial situation became precarious. It was not used as a test bed because the technology failed. These circumstances do not support a conclusion that the lease of the vehicle and payment by Debtor constituted an improper transfer to Higashi.

### N.  Debtor Paid $895,000 to ITLMC

The Trustee alleges in his opening post-trial brief that

> Higashi testified that CTD paid ITLMC about $895,000.00 in the approximately four years that CTD was in business. [ATT I: 2:37:40.] Higashi testified that the bulk of those payments constituted management fees, and that invoices supporting all payments to ITLMC were "all recorded in the books and records of the company." [ATT I: 2:37:50.] However, there was only $180,000 in supporting invoices. Higashi could offer no explanation of why the invoices would not be reflected on the general ledger; he said there was no other place to look for them." [ATT I: 2:32:23 *et seq.*] In addition, Higashi testified that Kuhl Wheels, EPX and defendant ES Design, LLC ("ESD") each paid ITLMC $50,000 a year for ITLMC's management services. [ATT I: 4:22:42.] Higashi was the principal of each of these entities; he caused payments to be made between or among them; and when notes or other instruments were signed, Higashi signed for both sides. Further, Higashi testified that some of CTD's management fees to ITLMC were deferred; thus, the fact that $895,000 was actually paid to ITLMC understates the amounts that changed hands.

This allegation is a smorgasbord of alleged misdeeds including payments between companies, a failure to produce records, individuals in small companies acting in dual capacities, and accounting irregularities. I have previously discussed the relationship between ITLMC and the Debtor, as well as the fact that for a long time, ITLMC directly paid all the expense of the related companies. The parent then back-charged the related companies, including the Debtor. Those companies then reimbursed ITLMC through transfers like those the Trustee maintains are fraudulent.

The testimony of Higashi and Marangell supported a conclusion that expenses such as employee costs were charged back from ITLMC to the Debtor. The payment of a

ORDER FOLLOWING TRIAL

management fee explained only a small part of the money that was due to ITLMC from Debtor.

The allegations as to what Kuhl Wheels, EPX, and ES Design may have paid or not paid to ITLMC are not relevant to this inquiry. This proceeding involved the Debtor and, to some extent, its independent relationship with the other companies. It is not the Debtor's concern whether ITLMC was charging too much in management fees from the other companies. In any event, the Trustee introduced no evidence to show that ITLMC overcharged those entities or the Debtor. He relied solely on an inference that any payment between the companies was improper and recoverable.

To the extent the Trustee contends that Higashi and the related entities are alter egos, I have addressed the point above. The testimony at trial showed these were small companies with separate purposes and it is often true that individuals act in dual capacities in such situations. The Trustee did not prove the companies essentially fused their operations so they should be treated as a single unit.

I do not know what to make of the Trustee's allegation that the Debtor deferred payment of some fees to ITLMC. Certainly, the Trustee's allegation supports the view that Debtor was running low on funds at the end of its life. But a payment that was deferred, in other words not made, is not a payment that is recoverable. So this argument is not successful. The Trustee has not met his burden of proving that ITLMC is liable for $895,000 in fraudulent transfers from the Debtor.

O. <u>Kuhl Wheels Transfers</u>

Kuhl Wheels[15] was a related entity that was involved in aftermarket vehicle wheels. It is not a named defendant. The Trustee alleges in his opening post-trial brief that

---

[15] The company referred to as Kuhl Wheels (sometimes styled Kühl Wheels) was a bit mysterious from the point of view of a fact-finder. There were apparently two companies—Kuhl Wheels, LLC and Kuhl Wheels Designs. The first developed steel wheels, and the second aluminum. Higashi's testimony describes the companies:

Q.   And what was the purpose of having a Kuhl Wheels and a Kuhl Wheels Designs as two separate business entities?

ORDER FOLLOWING TRIAL                                    32/44

Kuhl Wheels was not involved in pulley technology. Rather, it developed automotive wheels. The testimony at trial suggested that Kuhl Wheels assigned its wheel technology to CTD or ITLMC.[16] This appeared to have occurred shortly before a judgment was entered against the company and in favor of creditor Stan Watt. But I cannot find a fraudulent transfer in this allegation. The Trustee argues that a related company transferred technology to either the Debtor or ITLMC. This transfer may have been improper to Stan Watt as a creditor of Kuhl Wheels. But this transaction makes no difference to the Debtor's creditors. If anything, the company benefitted from receiving some intellectual property that might have value.

The argument that the Debtor failed to market this technology is not consistent with the testimony at trial. Higashi made presentations to companies like Toyota regarding both steel and aluminum wheels. He indicated that the technology might save Toyota $200 per vehicle. The witnesses testified that no sales resulted from these presentations.[17] At present, and assuming the transfer was lawful and to the Debtor, it would appear that the intellectual

---

A. Well, the—Kuhl Wheels was specifically formed to commercialize a steel wheel and the steel wheel market and aluminum wheel markets are—they're really completely separate. So Kuhl Wheels Designs was formed to market into the aluminum wheel market.

Transcript at 54:15-21. The companies were often referred to collectively during trial, and I am not sure that distinguishing them is necessary for purposes of this memorandum. I refer to them together as "Kuhl Wheels."

[16] Kuhl Wheels, LLC consented to the assignment of the license agreement to the Debtor. Exhibit 36. However, the assignment agreement names ITLMC as the assignee. Exhibit 38.

[17] Higashi testified that nothing came of the presentation to Toyota:

Q. What happened after your visit to Toyota of North America in terms of a potential relationship between Kuhl Wheels and Toyota?

A. As far as I can remember, nothing.

Transcript at 204:4–8.

ORDER FOLLOWING TRIAL                                              33/44

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

property remains in the bankruptcy estate of the Debtor. If this is true, then the Trustee is free to sell or market that technology if he finds reason to do so.

The transfer of the technology to Debtor and the allegation that Debtor failed to "competently exploit" does not constitute a fraudulent transfer. One might argue that the failure to exploit allegation falls into the category of a breach of duty by Higashi. I find no such breach. The uncontroverted testimony was that he and his team promoted the wheel design. There were no sales. No evidence was introduced to show this effort was carried out wrongfully. No evidence was introduced to support a conclusion that it was worth between $5 million and $20 million, or that it even has any value. If it has value, the Trustee has had the power to monetize it for more than nearly six years.

Even if liability attached to this item, there was no substantial proof introduced to show how the potential sale of pulleys that might save $200 per vehicle translates into damages of $5 million to $20 million. The sums claims were highly speculative and were not supported by competent evidence.

P.  $71,000 in Consulting Fees

The Trustee alleges in his opening post-trial brief that

> Higashi paid himself $71,000.00 in consulting fees in apparent contravention of Section 5.2 of CTD's Operating Agreement. [Exh. 1, account nos. 5230 (transaction nos. 110, 120, 121), 7730 (transaction nos. 671, 676, 779), 1011 (transaction no. 1678), 5360 (transaction nos. 1560, 1588, 1639, 1693), 7272 (transaction nos. 668, 671, 674, 675, 713, 756).]

The only testimony on this point came from Higashi, and was as follows:

> Q.  Exhibit 1, the general ledger, has expenses classified by account, and accounts numbers 5230, 7730, and several others show that you paid approximately $71,000 to yourself personally for consulting fees. Do you recall that?
>
> A.  Not specifically, but that...
>
> Q.  And even if you don't recall the specific amount, do you recall CT Drives paying consulting fees to you?
>
> A.  I presume. That's my salary.

ORDER FOLLOWING TRIAL

Q.      Do you know why it would have been called consulting
fees on the QuickBooks —

A.      I think in the operating agreement it states that they're
consulting fees. You know Connard Cali was being paid the
same amount.

Transcript at 147:22–148:9.

I do not find that these transfers are improper. In fact, I do not find that the Trustee has substantiated evidence of these transfers in the noted Exhibit 1. The approximately five thousand entries are in more-or-less random order. The Trustee provides transaction numbers, but those numbers are not unique, sequential, or sorted. Each referenced could be one of several transactions. Without a reference to unique identification of transfers, such as by additionally providing a transaction date, the court does not have any clear reference to substantiate the Trustee's claims.

Q. The Debtor Paid $53,543 in Personal Expenses for Higashi

The Trustee alleges in his opening post-trial brief that

Higashi caused CTD to pay him $53,543.00 for what appear to
be mostly or totally personal expenses. [Exh. 1, account nos.
1400, 5205, 5225, 6200, 6410, 7110, 7150, 7222, 7225, 7280).]

During the trial, Marangell testified that Higashi sometimes charged personal expenses to the company's Diners Club credit card. Marangell stated that the company owed Higashi money but he had asked Higashi not to use the Diner's Club charge to, in effect, reimburse himself. From an accounting standpoint, it is not ideal when a company's chief officer resorts to using the company's credit card to pay for personal expenses. From a burden of proof standpoint, though, the Trustee has not shown these transfers were fraudulent for four reasons.

First, none of the items included in the Trustee's claimed total of $53,543.00 were discussed at trial. Second, the payments referenced in the Trustee's summary of the expenses do not appear to be Diner's Club charges. They seem to be marked as payments from the Debtor to Higashi and other entities. Third, the payments are noted in Exhibit 1. As previously discussed, this piece of evidence is not very illuminating. And finally, Marangell testified that the Debtor owed Higashi money. The credit card "reimbursements" might be

Case: 13-05154    Doc# 168    Filed: 07/06/18    Entered: 07/06/18 11:41:55    Page 35 of
44

argued to be preferential payments to Higashi, but the complaint does not allege any preference liability.

There might be a claim that Higashi's use of the company credit card amounts to a breach of his fiduciary obligations to the Debtor. However, without relevant testimony and evidence, much less a coherent argument about what the charges are, I cannot assume that they are wrongful. The Trustee has not fulfilled his burden in demonstrating that these expenses were improper.

R. <u>Rent Payments Due from ES Design</u>

The Trustee alleges in his opening post-trial brief that

> CTD paid $19,800 in rent to Dominic Pipitone, the landlord for related entity ESD, but used the "audit trail" function in QuickBooks to falsely intimate that these payments were to CTD's landlord. [Exh. 1 at 79; Exh. 6, p. 39, lines 2914-2920.] Higashi admitted that he made multiple similar changes to the QuickBooks records, and prepared them for production, on the day they were produced to Conntechnical. [ATT I: 1:40:00.] Higashi testified that he was "not sure there was some sort of coverup" – which, of course, there was. [ATT I: 1:44:00.] While Higashi claimed to be unfamiliar with the "audit trail" function and with QuickBooks in general, he testified that he made the alterations in the QuickBooks files before they were produced. [ATT I: 1:43:20; Exhs. 6-7.] Higashi attempted to explain the changes as having been made for the purpose of changing vendor names that he considered to be trade secrets. But the changes went far beyond that, including the changing of landlord names and disguising payments to ITLMC as being made to "management company". Higashi, when shown the changed entries [see Exh. 7, including p. 1, lines 17-22], acknowledged that landlord names had been deleted, and that he had not told anyone he had made the changes. These facts not only suggest that monies were transferred far in excess of the amounts set forth herein; but also that, contrary to his testimony, Higashi was fully familiar with QuickBooks and how to change ledger entries to suit his purposes.

The facts asserted here are wide-ranging compendium of misdeeds revolving around a simply question: Did the Debtor pay rent of $19,800 to Dominic Pipitone ("Pipitone"), the landlord for ES Design?

At trial, Higashi testified that he altered the names of certain payees in the QuickBooks files. He stated that he changed the name of the recipient of the rent from

ORDER FOLLOWING TRIAL                                                          36/44

1  Pipitone to Landlord. He denied that the change was made to mislead and confirmed that

2  Pipitone was the landlord for ES Design.

3       Pipitone is not a defendant in this adversary proceeding. This is another example of

4  an allegation that a transfer to a non-defendant is fraudulent. No evidence was introduced to

5  show that the transfer benefitted anyone who is a defendant in the case. As such, the court

6  cannot find liability on behalf of any defendant.

7       S.   Misrepresentations to Cali

8       The Trustee alleges in his opening post-trial brief that

Higashi represented to Connard Cali ("Cali") of Conntechnical,
post-petition, that ESD (in which CTD held approximately a 45
percent interest) had been dissolved in August 2011. However,
Higashi admitted in deposition that ESD had never been
formally dissolved. Asked if he had told Cali that the dissolution
had taken place in August 2011, he said, "I don't deny it." [ATT
I: 4:17:30; Higashi Deposition at p. 97, ll. 3-14.] The decision *not*
to dissolve ESD was made because failure to pay annual
California corporation renewal fees "was a more economical
way to dissolve the company." [ATT I: 4:21:00.] CTD did not
list, in its schedules, its interest in ESD. [Exh. 26.] The Trustee
estimates the value of this undisclosed asset at $10,000.00.

16      There was almost no testimony at trial about the company known as ES Design (also

17  referred to as ESD). The limited testimony at trial did not support a conclusion that the

18  value of ES Design was $10 million. Higashi testified as follows in response to a question

19  about the plan for disposing of ES Design that the company had limited value:

20       A.   I believe we were trying to close out ES Designs.

21       Q.   For what reason?

22       A.   It was no longer useful to us.

23       Q.   Why was it no longer useful?

24       A.   We weren't using — well, the intent was to have ES
     Designs set up as a manufacturer of springs for the aftermarket
25     pulley —well, all pulleys, but primarily the aftermarket pulley,
     and the aftermarket business disappeared.
26

27  Transcript at 119:17–24.

28

Case: 13-05154   Doc# 168   Filed: 07/06/18   Entered: 07/06/18 11:41:55   Page 37 of
44

1     The testimony at trial did not support a firm conclusion the company was dissolved.

2    Higashi stated that the Debtor did not list any interest in ES Design in its bankruptcy

3    schedules because they "thought ES Designs had been dissolved — or at least was going to

4    be he believed the company had been dissolved." Transcript at 144:19–21. Higashi was not

5    aware of whether a formal dissolution had been filed and there was no testimony to show

6    that the Debtor retained a 45% ownership interest in ES Design.

7     I cannot find on this record that the Debtor's interest in ES Design was transferred

8    within the meaning of § 548(a). The company does not appear to have been transferred to

9    anyone. If the company was not dissolved, and it still exists, then Debtor would appear to

10    still own 45% of it (assuming that ownership percentage is correct). If it dissolved, that

11    would have occurred as a matter of state law on account of its failure to pay required fees.

12    Whatever value still exists in ES Design would have to be tested in the market.

13    T.  Assets Transferred to Spruli after Conversion to Chapter 7

14    The Trustee alleges in his opening post-trial brief that

15           Immediately upon the conversion of this case to Chapter 7,
16           Higashi formed Spruli, transferred CTD's assets to it, and began
               to market and sell CTD's products, to the detriment of CTD's
17           creditors. As explained more fully in paragraph "O" above and
               Part IV below, based on Higashi's and Marangell's own
18           estimates and projections, the value of these transferred assets
               was at least $5,000,000.00, and likely as much as $20,000,000.00.

19    The testimony at trial supported a conclusion that whatever technology, know-how,

20    good will, or intellectual property that Debtor owned at conversion was transferred to Spruli.

21    Higashi admitted that he concluded that the company's "secured creditors" were entitled to

22    pursue the continued development of the OEM pulley. He also admitted that he was waiting

23    for the Chapter 7 bankruptcy case to close so that all of these assets could be used by Spruli.

24    Moreover, Higashi represented to several different business prospects in e-mails that Spruli

25    was a continuation of the Debtor and development of the technology had been assumed by

26    Spruli. In fact, Spruli was posturing for sale or investment the very same pulley that the

27    Debtor had unsuccessfully attempted to perfect for market.

28

Case: 13-05154   Doc# 168   Filed: 07/06/18   Entered: 07/06/18 11:41:55   Page 38 of
44

The transfer of this property to Spruli was a post-petition, post-conversion transfer of estate assets. The transfer was not approved by the court and therefore falls squarely within the prohibition of § 549, which permits a trustee to recover unauthorized postpetition transfers. Accordingly, the court finds that any technology or like property transferred to or used by Spruli is to be restored to the Debtor.

No factual basis exists for a monetary award in connection with this transfer. There was no evidentiary support for the Trustee's claimed value of $5 million to $20 million. That range of figures is pure speculation. Thus, to the extent that the Trustee contends that Higashi (or any other party than Spruli) is liable, I deny any award or recovery to the Trustee.

## X. MARANGELL TRANSFERS

These transfers are alleged in the complaint's tenth cause of action, the parties' joint pre-trial statement, and the Trustee's opening post-trial brief.

### A. 480,000 Units in the Debtor

The Trustee contends that Marangell received a grant of 480,000 units of stock in the Debtor, and that this represents a fraudulent conveyance. Neither the facts nor the law support that contention.

Marangell was an employee of the Debtor from 2010 to 2011 and acted as the company's accountant (or chief financial officer) during that time. Over that time, he had several different agreements with the Debtor regarding his compensation. The initial agreement was that the Debtor would provide him with compensation of 30,000 units at a price of $0.01 per unit, and Marangell was permitted to purchase an additional 45,000 units. This agreement was intended to last six months (until November 1, 2010), at which point the ownership units would vest. Marangell paid the company $300 for 10,000 units.

Debtor sought to retain Marangell past the initial six month period. In October 2010, Marangell contends that he and the Debtor entered into an oral consulting agreement by

ORDER FOLLOWING TRIAL                                                                                      39/44

1   which he was authorized to purchase 50,000 of stock at a bargain price of $0.80/share. He

2   paid the company $40,000 total for these shares. He states that this was an oral agreement.[18]

3        Later, in approximately January 2011, Marangell entered into a revised written

4   employment agreement to address his longer tenure at the Debtor. The substance of this

5   agreement is described in Marangell's proposal to the company dated December 27, 2010.

6   Exhibit 28. According to that document, Marangell was awarded at total of 480,000 shares

7   of stock and his earlier grants of 30,000 and 50,000 were unwound.[19] The unsigned Unit

8   Award Agreement, effective date of January 1, 2011, does not track that proposal exactly,

9   but it provides for the issuance of 480,000 shares that vested a different intervals. Marangell

10  testified that as of the time he left the company, he was only vested in 230,000 shares.[20] The

11  list of equity security holders, however, shows that he owns 480,000 shares.[21] Exhibit 16.

12       This claim is very similar to the above claims regarding EPX and the Higashi Family

13  Trust's alleged receipt of ownership shares in the Debtor at prices lower than those offered

14  to investors. Regardless of the amount of shares possessed by Marangell, it does not amount

15  to a fraudulent conveyance. Creditors are not damaged when someone receives stock from a

16  company because their claims always have priority over shareholder interests. The Trustee

17  might argue that these shares were issued at a discount and that the Debtor received less

18  paid in capital than should have been contributed, but he has not. This argument, to the

19  extent the Trustee makes it, seems more like a failure to contribute capital than a fraudulent

20

21      [18] Marangell presented an unsigned Unit Purchase Agreement that mirrors the terms

22  of this agreement. Exhibit S. Marangell asserts that he and Higashi orally agreed to its terms.
        [19] The document states "I am currently the owner of 80,000 units of CT Drives,

23  30,000 were purchased in May, and 50,000 in October. In the interest of simplicity, I would
    like to unwind these transactions before year-end and instead receive an additional 80,000

24  Participation Units that are fully vested on award, and 96,000 Options to purchase units of

25  CT Drives at $1.00 Unit, also vested immediately on award."
        [20] Calculated as 80,000 of the originally issued units, which were effectively reissued,

26  plus 150,000 (representing three quarters in 2011 with 50,000 units vesting per quarter) for a

27  total of 230,000.
        [21] It is unclear if the equity security holder list makes any provision for vested versus

28  non-vested shares.

Case: 13-05154   Doc# 168   Filed: 07/06/18   Entered: 07/06/18 11:41:55   Page 40 of 44

conveyance. Such a transaction, if it occurred, might be improper but the court has not been supplied with any authority for the proposition that it constitutes a fraudulent conveyance.

    B. $40,000 Paid to Marangell in October 2010

Marangell testified that he paid the Debtor $40,000 for 50,000 units on October 7, 2010. Exhibit 24. The very next day, the Debtor initiated a wire transfer of $40,000 back to Marangell. Exhibit V. In other words, one day, Marangell invested $40,000 in the company and the next day, he paid himself back.

Marangell's explanations for this strange transaction were varied and far-fetched. Among other explanations, he stated that the $40,000 payment represented a prepayment for services rendered. Later, he issued bills to the company for October 2010 ($16,100) and November 2010 ($11,800) as well as a "pro forma" bill for December 2010 that he never provided to the Debtor ($22,400). Exhibit D. No written agreement supports this version of the story.

The company's accounting records, which Marangell prepared and maintained, likewise do not support his claim that the $40,000 represented prepaid services. When a company prepays an obligation, it records a prepayment as an asset account. The general ledger has a number of prepaid items including lawyers, accountants and others. Exhibit K. Marangell is not listed in this group. And upon close consideration, the ledger does not match the bank records. Exhibits 1, V. The ledger shows that $40,000 was transferred to one of Debtor's other bank accounts. The bank statement clearly shows the transfer was to Marangell personally.

An audit trail prepared by the Trustee highlights the discrepancy. Exhibit 103 at 19. In January 2011, the QuickBooks files were edited to delete three entries related to the transfer, including one that indicates Marangell payment of $40,000 to the Debtor was a 5-year loan at 4% interest. *Id.* Clearly, the Debtor's records were altered to obfuscate a transfer of $40,000 to Marangell. In fairness, Marangell disclaimed any knowledge of the audit trail document. But his explanation of this transaction makes no sense when compared to the accounting records he admitted maintaining.

ORDER FOLLOWING TRIAL                                                                    41/44

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The important point to remember in all of this is that no written agreement supports a view that the Debtor would pay Marangell in cash. Marangell did not provide any documentary evidence showing his entitlement to cash compensation. He contended that Higashi orally agreed to these terms.

But Higashi testified emphatically that Marangell was never entitled to any cash compensation. His testimony is entirely consistent with the revised arrangement for compensation dated January 2011. It specifies that Marangell got no cash compensation: "The Consultant [Marangell] acknowledges that the Units are being issued to the Consultant in consideration for past and future performance of services by the Consultant for the Company, *without payment of any cash compensation*." Exhibit W at § 2(i) (emphasis added). This document *post-dates* the transfer of $40,000. If there were a correction to make to the transaction, one would certainly expect that to be reflected in a document drafted months later. Instead, the revised agreement supports a view that Marangell was never entitled to cash compensation.

The Trustee alleged a transfer to Marangell of $40,000 that was either actually or constructively fraudulent. I find the transfer was actually fraudulent. To find Marangell's improper intent, I rely on (1) Marangell's close relationship with the company, (2) his access to and control of the accounting records, (3) the timing of the transfer the day, which occurred just one day after Marangell paid an identical amount for ownership units in the Debtor, (4) the consistency of Higashi's testimony with the available documentary evidence stating that Marangell was not entitled to cash compensation, and (5) the confused and self-contradictory explanations offered by Marangell at trial. No cognizable or plausible explanation has been offered to support the argument that the transfer was proper. Accordingly, the transfer is actually fraudulent under § 548(a)(1)(A).

## XI. CONCLUSION

For the reasons stated above, the court concludes that:

Case: 13-05154    Doc# 168    Filed: 07/06/18    Entered: 07/06/18 11:41:55    Page 42 of 44

1.  The transfer of assets to Spruli after the Debtor's case was converted to Chapter 7 was an unauthorized post-petition transfer pursuant to § 549. Those assets shall be restored to the Debtor.

2.  The $40,000 transfer to Marangell was actually fraudulent and shall be recovered.

3.  The Trustee has not met his burden of proof on the remaining causes of action.

The court will enter judgment in accordance with this decision.

**END OF ORDER**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COURT SERVICE LIST**

[ECF recipients]

EPX, Inc.
1484 Pollard Road, Suite 192
Los Gatos, CA 95032

ES Design, LLC
1484 Pollard , Suite 192
Los Gatos, CA 95032

Innovative Technologies Licensing and Management Corporation
107 Los Uvas Court
Los Gatos, CA 95032

Spruli, LLC
1484 Pollard Road, Suite 192
Los Gatos, CA 95032

William C. Milks on behalf of Defendant Robert Marangell
Law Offices of William C. Milks, III
960 San Antonio Rd. #200A
Palo Alto, CA 94303

William C. Milks on behalf of Defendant Robert Marangell
Law Offices of William C. Milks, III
40 Main Street
Los Altos, CA 94022

William C. Milks on behalf of Defendant Wayne Higashi
Law Offices of William C. Milks, III
960 San Antonio Rd. #200A
Palo Alto, CA 94303

William C. Milks on behalf of Defendant Wayne Higashi
Law Offices of William C. Milks, III
40 Main Street
Los Altos, CA 94022

ORDER FOLLOWING TRIAL

Case: 13-05154   Doc# 168   Filed: 07/06/18   Entered: 07/06/18 11:41:55   Page 44 of 44